Jeremy C. Sink (9916)
jsink@mbt-law.com
Gregory J. Adams (6159)
gadams@mbt-law.com
McKAY, BURTON & THURMAN
15 W. South Temple, Suite 1000
Salt Lake City, UT 84101
Telephone: (801) 521-4135
Facsimile: (801) 521-4252
Proposed Attorneys for the Debtor

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| In re: | : | Bankruptcy Case No.  18-23404 |
| FOOD FOR HEALTH INTERNATIONAL, | | |
| LLC, a Utah limited liability company, | : | Chapter 11 |
| Debtor. | | |
| | : | Honorable:    R. Kimball Mosier |

**MOTION FOR INTERIM AND FINAL ORDERS UNDER 11 U.S.C. 105, 363, 364(c)(1), (2), AND (3), 364(d) AND 364(e), FED.  R. BANKR. P. 2002, 4001, AND 9014, AND LOCAL RULE 4001-2: (1) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING ON SUPERPRIORITY AND SECURED BASIS, (2) GRANTING INTERIM RELIEF, AND (3) SCHEDULING A FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(c)**

Food For Health International, LLC ("FFH"), debtor and debtor in possession, hereby moves this

Court for interim and final Orders approving postpetition financing on a secured and

superpriority basis. A concise statement of the relief requested, required by Rule 4001 (c)(l)(B)

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 4001-2,

is set forth below. In support of this Motion FFH respectfully states as follows:

## Case Information and Jurisdiction

1. <u>Case Information</u>. The Debtor commenced this case under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. 101, el seq. (the "<u>Bankruptcy Code</u>"), by filing a voluntary petition on May 11, 2018. No creditors' committee, trustee or examiner has been appointed in this case. Information regarding the background, assets, business, claims against, and circumstances leading to this chapter 11 filing is contained in the declaration of Albert Altro, the Chief Restructuring Officer of FFH, dated May 16, 2018 (Docket No. 15 the "Altro Decl"). The Altro Decl. was previously served on parties in interest in support of other motions filed by the Debtor.

2. <u>Jurisdiction, Venue, and Core Proceeding</u>. This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. 157(b)(2)(A), (D), and (O) and the Court has jurisdiction to enter a final order.

3. <u>Debtor Operating as Debtor in Possession</u>. The Debtor continues to operate its business and manage its properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## Relief Requested

4. <u>Approval of DIP Facility</u>. By this Motion, and pursuant to sections 105(a) and 364(c), (d) and (e) of the Bankruptcy Code and Bankruptcy Rule 4001 (c), the Debtor requests approval of secured postpetition financing to permit the Debtor to continue to maintain and preserve its assets, operate its business, and to market and sell those assets and business enterprise for the benefit of the Debtor's creditors and estate.

3

## The Proposed DIP Facility

5.    <u>Introduction</u>. The Debtor needs funds with which to fund payroll of its remaining employees, pay current and ongoing operating expenses, and pay professionals. These are critical expenses which if not paid will result in substantial, irreparable harm to the Debtor's estate and its creditors.

6.    <u>Proposed Interim and Final Financings</u>. The Debtor seeks interim and final Orders:

a. Pursuant to Bankruptcy Code sections 105, 364(c)(l), 364(c)(2), 364(c)(3), 364(d) and 364(e), Bankruptcy Rules 2002, 4001 (c), and 9014, and Local Rule 4001-2, authorizing the Debtor:

(l)    to obtain secured postpetition financing (the "DIP Facility"), up to an aggregate principal amount not to exceed $2,100,000, from Exemplar Design, LLC (together with its successors, participants, and assigns, the "Lender"), pursuant to the Senior Secured, Superpriority Debtor in Possession Loan and Security Agreement, dated as of May 22, 2018, substantially in the form attached hereto as <u>Exhibit A</u>[1] (as amended, supplemented, or otherwise modified from time to time, the "DIP Loan Agreement"); and

(2) to grant to the Lender, in order to secure the Debtor's obligations under the DIP Facility, (A) priority in payment with respect to such obligations over any

---

[1] The attached Loan and Security Agreement is finalized but has not been executed by the parties. It will be filed as soon as it is executed.

and all administrative expenses, including the kinds specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, or any other provisions of the Bankruptcy Code, subject to the Carve-Out (as defined below), (B) pursuant to section 364(c)(2) of the Bankruptcy Code, a fully perfected lien on the Collateral consisting of property that was unencumbered (if any) as of the Petition Date,  (C) pursuant to section 364(c)(3) of the Bankruptcy Code, a fully perfected lien on the Collateral consisting of property that was subject to valid, perfected, and unavoidable liens as of the Petition Date, which lien is junior to valid, perfected, and unavoidable liens as of the Petition Date and (D) pursuant to section 364(d) of the Bankruptcy code and pursuant to the subordination agreement between Mountain Labs Holding, LLC and the Lender, a first position senior lien on all property of the estate, other than purchase money security interest liens in favor of equipment providers. The Collateral includes any and all rights, claims, and other causes of action of the Debtor's estate including any actions asserted by the Debtor or any subsequently appointed trustees or representatives of the Debtor's estate under any section of the Bankruptcy Code, and in each case, all proceeds resulting therefrom, including all recoveries under sections 542 and 543 of the Bankruptcy Code and avoidance actions under sections 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code.

b.      Pursuant to Bankruptcy Rule 4001 (c) and Local Rule 4001-2, and after a preliminary hearing on this Motion, authorizing the Debtor to borrow from the Lenders under the DIP Loan Agreement up to an aggregate of $2,100,000, all upon the terms and

5

conditions set forth in the DIP Loan Agreement and such entry of an interim Order

pending the Final Hearing (as defined below).

c.       Scheduling a final hearing (the "<u>Final Hearing</u>" and establishing notice

procedures with respect to the Final Hearing, by this Court, to consider entry of a final

Order (the "<u>Final Order</u>") authorizing, on a final basis, the DIP Facility.

<u>SUMMARY OF TERMS OF THE DIP FACILITY</u>

| Material Provision | Brief Summary | Pages in Agreement and Proposed Order |
|---|---|---|
| Borrower | The Debtor | Agreement, p. 3 |
| Lender | Exemplar Design, LLC | Agreement, p. 3 |
| Regular Interest Rate for Loan | 12.0% | Agreement, p. 8 |
| Default Interest Rate for Loan | 18.0% | Agreement, p. 6 |
| Fees and Expenses | No fees, Borrower agrees to defend, indemnify, and hold harmless Lender and Lender's directors, officers, employees, affiliates, representatives, attorneys and agents (each an "<u>Indemnified Person</u>") from and against any and all penalties, fines, liabilities, damages, costs, or expenses of whatever kind or nature asserted against any such Indemnified Person, arising out of, or in any way related to this Agreement or any other Loan Document, or the transactions contemplated hereby or | Agreement, pp. 39 |

| | | |
|---|---|---|
| | thereby, including by reason of the violation of any Law or regulation relating to the protection of the environment or the presence, generation, disposal, release, or threatened release of any hazardous materials in connection with Borrower's business on, at or from any property at any time owned or operated by Borrower, including reasonable attorneys' and consultants' fees, investigation and laboratory fees, court costs, and litigation expenses actually incurred | |
| Maturity | June 8, 2018, unless the Final Order shall have been entered on or before such date, in which case the Maturity Date shall mean July 31, 2018. | Agreement, p. 10 |
| Liens, Collateral, and Priority (Bankruptcy Rule 4001 c)(1)(B)(i), (vii), and (xi)) | To secure the Obligations, Borrower hereby unconditionally grants, assigns, and pledges to Lender valid, continuing, enforceable and fully perfected, first priority priming Liens and security interests pursuant to Section 364(d)(1) of the Bankruptcy Code, senior to all Liens of any lienholder regardless of when the Liens were obtained and regardless of their previous priority, including without limitation the Liens securing the Prepetition Lender Obligations and any other existing obligations as of the Petition Date (but excluding Permitted Encumbrances, including the Professional Expense Carve-out), in all tangible and intangible assets of Borrowers, whether now owned or hereafter acquired or arising and wherever located, including Borrower's right, title and interest in and to all Real Estate, Accounts, Chattel Paper, Contracts, Documents, Equipment, Fixtures, General Intangibles, goods, Instruments, Inventory, Intellectual Property, Investment Property, Tax Refund Proceeds, all deposit and bank accounts and deposits therein, all money, cash or cash equivalents, and to the extent not otherwise included, all Proceeds and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing, including all of Borrower's property recovered under Bankruptcy Code Sections 542 and 543 and all Bankruptcy Recoveries and avoidance actions under the Bankruptcy Code, including Sections 544, 545, 547, 548, 549 and 550 (all of the foregoing, and any other assets or property of Borrower, being hereinafter referred to collectively as the "Collateral"). | Agreement, pp. 19 |

| | | |
|---|---|---|
| | Borrower also hereby unconditionally grants, assigns, and pledges to Lender valid, continuing, enforceable and fully perfected, (y) first priority Liens and security interests pursuant to Section 364(c)(2) of the Bankruptcy Code on all Collateral that is otherwise unencumbered as of the Closing Date; and (z) junior priority Liens and security interests pursuant to Section 364(c)(3) of the Bankruptcy Code on all Collateral that is subject to a Permitted Encumbrance as of the Closing Date | |
| Conditions to Lending | Conditions precedent to the Lender's obligation to lend include, among other conditions, (including the Initial Advance), that the Lender be satisfied, in its reasonable discretion, with the results of its on-going due diligence investigation; with other Advances under the DIP Facility, the Lender must be satisfied in its sole and absolute discretion with the results of its on-going due diligence investigation among the other items set forth in Section 3 of the Agreement. | Agreement, pp. 16-18 |

| | | |
|---|---|---|
| Events of Default | An Event of Default under the DIP Facility shall occur if:<br><br>(a)  Debtor (i) fails to make any payment of principal of, or interest on, the Loan or any of the other Obligations when due and payable, or (ii) fails to pay or reimburse Lender for any expense reimbursable hereunder or under any other Loan Document within 10 days following Lender's demand for such reimbursement or payment of expenses;<br><br>(b)  Debtor fails or neglects to perform, keep or observe any provision of the DIP Loan Agreement, the Note, or any other Loan Document;<br><br>(c)  Any representation or warranty made by the Debtor in the DIP Loan Agreement, or any of the Loan Documents, or any financial statement, or any statement or representation made in any other certificate, report or opinion delivered in connection therewith proves to have been incorrect or misleading in any material respect when made;<br><br>(d)  there occurs any uninsured damage to or loss, theft or destruction of any portion of the Collateral that could reasonably be expected to have a Material Adverse Effect;<br><br>(e)  Debtor breaches or violates any term of the Interim Order or the Final Order;<br><br>(f)  Debtor uses Advances for purposes not authorized under the Budget (subject to the Permitted Variance);<br><br>(g)  the creation, existence, or allowance of any Indebtedness, whether recourse or nonrecourse, and whether superior or junior, resulting from borrowings, loans, advances, or the granting of | Agreement, pp. 30 to 33 |

9

credit, whether secured or unsecured, except (i) Indebtedness to Lender arising under or as a consequence of the DIP Loan Agreement or the other Loan Documents and (ii) Indebtedness existing on the Petition Date or otherwise expressly permitted under the DIP Loan Agreement, the Interim Order, the Final Order or the other Loan Documents;

(h)   the creation, existence or allowance of any Liens on any of Debtor's properties or assets except the Liens existing as of the Petition Date and the Liens created or permitted under the DIP Loan Agreement, the Interim Order, the Final Order or the other Loan Documents; or

(i)   the occurrence of any of the following in the Bankruptcy Case:

(i)   the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by Debtor: (w) to sell any assets of Debtor through a sale under Section 363 of the Bankruptcy Code; (x) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to the DIP Loan Agreement; (y) to grant any Lien upon or affecting any Collateral; or (z) any other action or actions adverse to Lender or its rights and remedies hereunder or its interest in the Collateral;

(ii)   the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Interim Order or the Final Order without the written consent of Lender, or the filing of a motion for reconsideration with respect to the Interim Order or the Final Order;

(iii)    the Final Order is not entered immediately following the expiration of the Interim Order;

(iv)    the payment of, or application for authority to pay, any prepetition claim without Lender's prior written consent or pursuant to an order of the Bankruptcy Court after notice and hearing unless otherwise permitted under the DIP Loan Agreement;

(v) the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any of the Collateral; (vi) the appointment of an interim or permanent trustee in the Bankruptcy Case or the appointment of a receiver or an examiner in the Bankruptcy Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of Debtor; or the sale without Lender's consent, of all of Debtor's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Bankruptcy Case, or otherwise that does not provide for payment in full of the Obligations and termination of Lender's commitment to make the Advances;

(vii)   the dismissal of the Bankruptcy Case, or the conversion of the Bankruptcy Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or the filing of a motion or other pleading by Borrowers seeking the dismissal of the Bankruptcy Case under Section 1112 of the Bankruptcy Code or otherwise;

(viii)   the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor to execute upon or enforce a Lien on any Collateral;

(ix)    the commencement of a suit or action against Lender and, as to any suit or action brought by any Person other than Debtor or a subsidiary, officer or employee of Debtor, the continuation thereof without dismissal for thirty (30) days after service thereof on Lender, that asserts by or on behalf of Debtor, the Environmental Protection Agency, any state environmental protection or health and safety agency, or any official committee in the Bankruptcy Case, any claim or legal or equitable remedy which seeks subordination of the claim or Lien of Lender;

(x)      the failure of a plan of reorganization in form and substance satisfactory to Lender to be filed in the Bankruptcy Case on or before the tenth 10th day following the Relief Date;

13

| | | |
|---|---|---|
| | (xi)      the failure of the plan of reorganization in form and substance satisfactory to Lender to be confirmed in the Bankruptcy Case on or before July 31, 2018; or<br><br>(xii)      the entry of an order in the Bankruptcy Case granting any other superpriority administrative claim or Lien equal or superior to the claims and Liens granted to Lender. | |



15

| | | |
|---|---|---|
| Limitation on Use of Proceeds (Bankruptcy Rule 4001 -1 | "Professional Expense Carve Out" shall mean a carve out for the following expenses: (i) all fees required to be paid to the Clerk of the Bankruptcy Court; (ii) all statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c); (iii) all Allowed Professional Fees incurred on or before the date of service of a Carve Out Trigger Notice, as limited by the respective amounts set forth in the Budget for each Case Professional or category of Case Professional through the date of service of said Carve Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice less the amount of pre-petition retainers received by such Case Professionals; and (iv) all Allowed Professional Fees incurred after the date of service of a Carve Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $25,000 less the amount of pre-petition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (iii) above. The Professional Expense Carve-Out shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals. | Agreement, p. 11-12 |
| Indemnity (Bankruptcy Rule 4001 (c)(1)(B)(ix)) | Borrower agrees to defend, indemnify, and hold harmless Lender and Lender's directors, officers, employees, affiliates, representatives, attorneys and agents (each an "Indemnified Person") from and against any and all penalties, fines, liabilities, damages, costs, or expenses of whatever kind or nature asserted against any such Indemnified Person, arising out of, or in any way related to this Agreement or any other Loan Document, or the transactions contemplated hereby or thereby, including by reason of the violation of any Law or regulation relating to the protection of the environment or the presence, generation, disposal, release, or threatened release of any hazardous materials in connection with Borrower's business on, at or from any property at any time owned or operated by Borrower, including reasonable attorneys' and consultants' fees, investigation and laboratory fees, court costs, and litigation expenses actually incurred. | Agreement, p. 39 |

7.      Extraordinary Relief under Local Rule 4001-2. The DIP Loan Agreement

provides for "extraordinary relief" identified in Local Rule 4001-2(a)(1) as it proposes at a bare

minimum acknowledgement of a valid perfected first position lien in favor of Mountain Labs

Holding, LLC in an amount of at least $750,000, secured interests in the Lender to avoidance

actions, and priming of secured liens in position after Mountain Labs Holding, LLC without

their consent.

Although the DIP Loan Agreement grants to the Lender liens on avoiding causes of action, the

liens will not secure the obligations of a "prepetition secured creditor."

<h2 style="text-align:center">FACTUAL BACKGROUND</h2>

8.      Background of the Debtor, Its Assets, and Business.  The   Debtor's objective in

this Chapter 11 Case is to keep the company open t in order to maximize the value of the Company's

assets for the benefit of all stakeholders and to maintain the business as a going concern, thereby

preserving jobs and important vendor relationships.  With those goals in mind, beginning in January

2018, the Company undertook multiple restructuring initiatives to improve the Company's operations and

retained an investment banker to engage in a sale process to find equity investors or a buyer of the

Company's assets.  The Company and its investment banker contacted potential buyers, and conducted

management calls with potential parties.  Ultimately, however, no executable transaction came from these

extensive marketing efforts.

9.      During this time, the Debtor has worked extensively with the Company's

Secured Lenders (defined below) to facilitate a successful sales process and to  maintain the

Company's business as a going concern.  The Secured Lenders agreed to forbear from exercising

remedies available to them under the Loan Agreements (defined below) in order to provide the

Company with additional time to implement its various initiatives.  In addition, the Debtor  has

secured debtor-in-possession financing ("DIP Loan"), subject to bankruptcy court approval, from

Exemplar Design, LLC (hereinafter "Lender") to provide cash funding in order to allow the

Debtor to continue its sale initiatives and its marketing, and to fund the administration of the

Debtor's Chapter 11 Case through the use of the debtor-in-possession financing and cash

collateral, subject to the terms of the Cash Collateral & Debtor in Possession Financing Order

(defined below).

10.    Finally, in April 2018, it became evident that the Company had exhausted all of

its out-of-court options.  The Company and the Lender then engaged in extensive negotiations

that culminated in the Company's post petition entry into the DIP Lending Agreement and are in

negotiations to enter into an Asset Purchase Agreement (defined below) under which the Lender

is conducting due diligence on whether to credit bid their DIP Loan and assume certain liabilities

to purchase substantially all of the Company's assets, subject to higher or otherwise better offers.

11.    On the Petition Date, the Debtor filed without finalizing the DIP Loan documents

to avoid eviction at the hands of its landlord.  The eviction hearing was scheduled to be heard

two hours after the filing.

12.    The Debtor has continued its marketing and sale process for the Debtor's assets as

of the date of the petition, but these efforts have not yielded bidders more than the hoped for

credit bid by the Lender plus the assumption of debt of certain equipment leases and obligation,

assumption of the lease for the real property where the facilities are located and  subject to terms

to be agreed upon by the parties.    The Company's marketing efforts clearly established a lack of

interest in the Company's assets likely due to the under-performance and losses recorded by the

Company.   Furthermore, the Company's performance has only declined since these marketing efforts which provides further doubt as to real interested parties in the market.

13.     The hoped for sale process with the Lender will prevent the Company's business from deteriorating further, allow the Company's business to continue as a going concern, thereby preserving jobs and important vendor relationships, and will ensure that the Company obtains maximum value for its assets for the benefit of all stakeholders and assumed creditor debts, subject to higher and better offers, if any.   Further, Mountain Labs Holdings, LLC has consented to the Debtor's usage of cash collateral as well as subordinating its first position lien to the proposed DIP financing, which will provide the Debtor with sufficient liquidity along with the availability under the debtor in possession financing agreement to operate during the Chapter 11 Case and to effectuate the hoped for sale or a higher and better offeror.

14. FFH is headquartered in Salt Lake City, Utah

**A.     Company History**

15.   Formed in approximately 2008, FFH is a contract manufacturer of raw ingredients and finished goods for the nutrient and supplement industry for a limited number of customers.   The Company's 3PL business began in the second quarter of fiscal year 2017.   The Company has not generated earnings in this line of business since the Company's purchase by the new owners on November 4, 2016.

16. The Company's customers in the food line of business include direct to consumer sales sold through an e-commerce platform.   In addition, the Company's customers include 1. Contractors requiring the manufacture of proprietary formulas provided to the Company and 2. Contractors requiring the manufacture of products designed by the Company.   The distribution channels in this industry are segmented into large

Retail Chains (example GNC), Manufacturers (example Genysis Brand Solutions), and Multilevel Marketing Companies (example: Herbalife).

17. The Company's customers in the 3PL line of business are typically made up of small local distributors of various products that are shipped direct to consumer and small retail chains.

18. During the 2017 fiscal year, the Company reported sales of $12.4 million and a net loss of $7.9 million.

**B. Secured Debt**

19.    On December 29, 2016 FFH entered into a financing agreement (the "Secured Financing Agreement") with Food for Health Acquisitions (the "Senior Secured Lender" also known as Mountain Labs Holding, LLC).   Under the Secured Financing Agreement and all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, instruments, amendments, and any other agreements delivered pursuant thereto or in connection therewith (collectively with the Secured Financing Agreement, the ("Secured Loan Documents"), the Senior Secured Lender made a secured loan to the borrower initially in the aggregate principal amount of $750,000.   The proceeds of the Loan were used to fund working capital requirements of the business.   Subsequent to the $750,000 initial loan, from February 15, 2017 through August 10, 2017, the Lender advanced an additional $2,123,000 under the Secured Loan Documents.   The proceeds of the loans made under the Secured Financing Agreement were used to continue to fund the working capital requirements of the business.

20.     The loans made under the Secured Loan are secured by first priority liens on substantially all of the Debtors' assets, including all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, general intangibles (including, without limitation, all payment intangibles), goods, instruments (including, without limitation, promissory notes), inventory, investment property, copyrights, patents and trademarks and licenses, letter-of-credit rights, supporting obligations, proceeds (including cash and noncash proceeds) and products of any of the foregoing collateral.   Pursuant to the Secured Financing Agreement, the Senior Secured Creditor is senior in priority and must be indefeasibly paid in full in cash before any payment can be made on account of the Junior or unsecured creditors / lenders.

21.     The secured loan made under the Secured Financing Agreement matures on demand by the holder.   As of the Petition Date, the Debtor is obligated to pay $2,873,000 in aggregate principal amount to the Secured Lenders, plus accrued but unpaid interest and fees.

### C.  Equipment Financing Loans

22. The Company received approximately $2.9 million from lenders to finance certain capital expenditures.  As of March 31, 2018 the total reported liability related to these equipment loans was approximately $838,000.

### C.     Subordinated Debt

23.     Prior to 2017 the Company received approximately $6.6 million from other lenders. These lenders are commonly referred to as friends and family of the former owner Frank Davis.

21

**D.     Other Unsecured Debt**

24.     As of the Petition Date, the Debtors estimate that their unsecured debt, excluding

amounts owed noted above, is between $6,000,000 and $7,000,000, and consists primarily of

accounts payable to vendors, accrued but unpaid expenses, and a loan from Brentwood Capital.

**E.     Equity**

25.     FFH, has one member which owns 100% of the member interests.

**<u>EVENTS LEADING TO THIS CHAPTER 11 CASE</u>**

26.     The Company has reported losses since 2015.  In 2013 and 2014 the Company

focused on survival food products.  In 2015 the company refocused its business toward the vitamin

and health supplement markets.  The change in focus result a significant reduction in revenue $40.2

million in 2015 to $24.1 million in 2016 and $12.4 million in 2017.  The reduction in revenue

adversely impacted margins, and as a consequence, losses significantly increased.   Also

contributing the additional losses in 2016 and 2017 was the decision expand its service offerings

to include the third-party logistics.  During 2016 the Company began looking for a capital partner.

The search resulted in the formation of Food for Health Acquisitions ("Acquisitions").  On or

about November 4, 2016 Acquisitions closed on the sale of the business and installed a new

management team.  From the close of the transaction through the spring of 2017 new management

uncovered a significant cash burn rate not previously disclosed.  Certain liabilities were not

disclosed to the acquiror which required payment in order to avoid costly litigation and potential

business failure; in addition, assets assumed (principally accounts receivable) were not recovered

post acquisition and may not have been valid.   Additional funding of more than $2,000,000 and

the implementation of cost cutting moves and liquidity tactics failed to sufficiently improve the

operations of the business. In addition, the Company suffered from a significantly overleveraged balance sheet from prior rounds of funding from private investors. The demands of the investors and other creditors provided no choice but to seek protection under the Bankruptcy Code.

27.    As of the Petition Date Mountain Labs Holdings, LLC (formerly known as Food for Health Acquisitions) owned 100% of the member interests of FFH. The owners have owned FFH since November 4, 2016 and believe the Company and its remaining stakeholders would benefit from the involvement of new owners as it focuses on executing its next phase of turn-around and growth. The investors of the Senior Secured Creditor continue to support FFH and remain flexible regarding transaction structure in light of the Company's turn-around prospects and the firm interest in the Company by the DIP Lender.

**28.**    The anticipated Asset Purchase Agreement will be subject to higher and better offers, if any,  provides the best course of action for all the Company's stakeholders and avoids liquidation preserving approximately 70 jobs.

**F.**  The Debtor's Financing Requirements.

29.    <u>The Debtor Needs Funding to Pay Operating Costs, Salaries. and Professional Fees and Expenses</u>. The Debtor's assets are valuable, but in order to properly recover, market, and sell those assets, the Debtor requires that it have funding to cover certain operating costs.

<u>ARGUMENT</u>

**A.**    **Approving the DIP Facility Is Appropriate under Section 364 of the Bankruptcy Code**

The DIP Financing will enable the Debtor to maintain the value of its assets through the ongoing payment of the Debtor's operating expenses and costs of administration of its Chapter 11 cases.

23

Section 364(c) of the Bankruptcy Code provides that if the "trustee" (including a debtor

in possession) is unable to obtain unsecured credit allowable under section 503(b)(l) of this title

as an administrative expense, the Court may authorize the obtaining of credit or the incurring of

debt

> (l) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

> (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or

> (3)    secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. 364(c). Further Section 364(d) provides for a lien senior to all other secured parties.
In this case the Lender seeks a senior lien.  The Debtor has received the consent of Mountain
Labs Holdings, LLC to obtain a senior lien before them.  The DIP Facility provides for the types
of protections contemplated by

Bankruptcy Code sections 364(c)(l), (c)(2), (c)(3) and (d)(1).

The DIP Facility provides the Lender with the following protections:

a.   Superpriority administrative claim status pursuant to Bankruptcy section

364(c)(l), subject to the Carve-Out.

b.   A first priority lien on the unencumbered Collateral, if any,

c.   a lien junior to valid perfected liens as of the Petition Date;

d.   a senior lien on all assets of the estate, excluding equipment secured by PMSI

liens.

The Debtor has been unable to find a lender that would loan on an unsecured or

administrative expense basis. As a condition to extending the Facility, the Lender requires the

protections contained in Bankruptcy Code 364(c)(1), and 364(c)(2) to the extent there are

unencumbered assets of the estate, and 364(c)(3) and (d)(1) as to liened assets.

Courts have outlined a three-part test to determine whether a debtor is entitled to section

364(c) financing. Specifically, courts look to whether the debtor is unable to obtain unsecured

credit under section 364(c)(l), i.e., by allowing a lender an administrative claim only; whether the

financing benefits and is necessary to preserve the assets of the estate; and whether the terms of

the financing are fair, reasonable, and adequate given the circumstances of the debtor and the

proposed lender. In re Ames Dept. Sores, Inc., 1 15 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990). The

statute "does not require the debtor to seek alternate financing from every possible lender." In re

495 Central Park Avenue Corporation, 136 B.R., 626, 630-31 (Bankr. S.D.N.Y. 1992). Rather, a

debtor must demonstrate that it made a reasonable effort to seek credit from other sources available

under Code 364(a) and (b). See In re Snowshoe, Inc., 789 F.2d 1085, 1088 (4th Cir.

1986).

These standards are satisfied here. The Debtor's efforts to seek necessary postpetition

financing from other potential lenders satisfy the statutory requirements of section 364(c) of the

Bankruptcy Code. See, e.g., Ames Dept. Stores, 1 15 B.R. at 40 (holding that debtor made

reasonable effort under the section 364(c) where it approached four lending institutions, was

rejected by two and ultimately selected the least onerous option from the remaining two

lenders); In re Florida West Gateway, 147 B.R. 817 (Bankr. SD. Fla. 1992) (finding that the

objecting creditor's unwillingness to offer financing on equal or better terms was evidence that

the debtors were unable to secure credit without a priming lien). Accordingly, approval of the

DIP Facility accords with the requirements of' section 364(c) of the Bankruptcy Code.

25

By this Motion, the Debtor seeks approval of a $2,100,000 DIP Facility, of which up to

$750,000 is needed during the next two weeks. Accordingly, the Debtor seeks (A) immediate,

interim approval of $750,000 in financing, and (B) final approval of the full $2,100,000

following the requisite 14-day notice period required by Bankruptcy Rule 4001.   The interim

relief requested by the Debtor is precisely what is contemplated by Bankruptcy Rule 4001 and

should be granted to avoid immediate and irreparable harm to the Debtor's estate. The Debtor

will serve this Motion via overnight courier and/or other expedited means on the United States

Trustee, the holders of the 20 largest unsecured claims against the Debtor and their counsel

(when known), the largest secured creditors and their counsel (when known), the Internal

Revenue Service, the Utah State Tax Commission, and the Salt Lake County Treasurer.

B.      Emergency Consideration of this Motion is Appropriate

Bankruptcy Rule 4001 (c) governs the procedures for consideration of motions to obtain

postpetition financing. Rule 4001(c)(2) provides for an expedited consideration of the motion for

funds necessary before final consideration of the proposed debtor in possession financing:

> The court may commence a final hearing on a motion for authority to obtain
> credit no earlier than 14 days after service of the motion. If the motion so requests,
> the court may conduct a hearing before such 14 day period expires, but the court
> may authorize the obtaining of credit only to the extent necessary to avoid
> immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P.4001(c

Courts have recognized that immediate interim relief may be crucial to the success of a

corporate reorganization:

> We realize that in certain circumstances, the entire reorganization effort may be
> thwarted if emergency leave is withheld and that reorganization under the
> Bankruptcy Code is a perilous process, seldom more so than at the outset of the

proceedings when the debtor is often without sufficient cash flow to fund a central
business operation.

Owens-Corning Fiberglass Corp. v. Center Wholesale, Inc. (In re Center Wholesale, Inc.),

759 F.2d 1440, 1449, n. 21 (9 th Cir. 1985) (citing In re Sullivan Ford sales, 2 B.R. 350, 355

(Bankr. D. Me. 1980).

The DIP Facility is needed to pay the essential operating expenses of the Debtor,

including critical expenditures to be made in the first 25 days of Debtor's case. The Debtor must

borrow under the DIP Facility immediately, as those funds are necessary to pay critical

operating expenses, payroll, utilities (and utility deposits that may be required by Bankruptcy

Code section 366), and other essential expenses. Absent satisfying payroll and other essential

expenses, the Debtor may need to terminate payment of critical expenses, which will severely

impair the value of the Debtor's assets. The Debtor will suffer "immediate and irreparable harm

to the estate" absent emergency consideration of the relief requested in this Motion.

C. Approval of the DIP Facility Is Supported by the Debtor's Exercise of Sound
    Business Judgment

That the Debtor has satisfied the requirements of Bankruptcy Code section 364 does not

end the inquiry, because this section is permissive, not mandatory. See Bankruptcy Code section

364(c)(l) ("the court, after notice and a hearing, may authorize the obtaining of credit or the

incurring of debt") (emphasis added). When reviewing a debtor's business decision, such as the

Debtor's decision to enter into the DIP Facility, bankruptcy courts routinely defer to the debtor's

business judgment, so long as the decision was "made in good faith, upon a reasonable basis,

and within the scope of [the debtor's] authority under the Code." In re Curlew Valley Assocs., 14

B.R. 506, 513-14 (Bankr. D. Utah 1981). Specifically in the context of postpetition financing,

bankruptcy courts generally will respect a debtor in possession's business judgment regarding the need for and the proposed use of funds. As the court noted in Ames Dep't Stores:

> A court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.

1 15 B.R. at 40.

The power of a debtor in possession to incur secured debt follows necessarily from its general power to operate its business in the exercise of its business judgment. See 11 U.S.C. § 1108. Without the ability to incur secured debt, the debtor in possession would be placed at a significant competitive disadvantage and its efforts to reorganize could be seriously impaired.

In the present case, the Debtor's decision to obtain the DIP Facility represents the exercise of sound business judgment in preservation of the value of the Debtor's assets and the process to consummate a reorganization plan.

The substantial benefits the Debtor will derive from the proposed financing amply justify the Debtor's decision to enter into the DIP Facility, a decision the Court should ratify as being in the best interests of the Debtor and its estate.

D.      Notice

No trustee, examiner or creditors' committee has been appointed in this case. This Motion has been served on: the twenty largest unsecured creditors and their counsel (when known), the largest secured creditors and their counsel (when known), the United States Trustee, the Internal Revenue Service and the Utah State Tax Commission.  Notice of the interim and proposed final hearings on this Motion, with a description of this Motion and instructions for

receiving a copy of this Motion for no charge, was given to all parties listed on the mailing

matrix in this case. The Debtor respectfully requests that the Court set a Final Hearing as soon as

the Court's schedule can accommodate, and an objection deadline related thereto. The Debtor

requests that the Court deem such notice of the Final Hearing to be sufficient notice under

Bankruptcy Rule 4001.

CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter an Order,

substantially in the form of the Interim Order (l) authorizing the Debtor to enter into the DIP

Facility on an interim basis with the Lender pursuant to the terms of the DIP Loan Agreement,

and to borrow up to $750,000 pending entry of the Final Order; (2) granting the Lender

(a) administrative expense priority under Bankruptcy Code section 364(c)(l) with respect to the

DIP Obligations, subject to the Carve-Out, (b) a perfected first-priority, non-avoidable lien on

unencumbered Collateral, if any, pursuant to Bankruptcy Code section 364(c)(2), a perfected

non-avoidable lien junior to valid perfected non-avoidable liens on Collateral as of the Petition

Date and a senior lien pursuant to Section 364(d) of the Bankruptcy Code, to secure the DIP

Obligations; (3) setting a hearing on the final approval of the DIP Facility for as soon as the

Court's schedule can accommodate, and an objection deadline as approved by the court; (4)

following such Final Hearing, approving the DIP Facility on a final basis, and (5) authorizing

the Debtor to execute any and all documents and take such other actions as necessary to

effectuate the transactions contemplated by the DIP Facility.

DATED this 22 day of May, 2018.

McKay, Burton & Thurman, P.C.

By: /s/ Jeremy C. Sink

29

Jeremy C. Sink (9916)
Gregory J. Adams (6159)
McKAY, BURTON & THURMAN, P.C.
15 W. South Temple, Suite 1000
Salt Lake City, Utah 84101
Telephone: (801) 521-4135
Facsimile: (801) 521-4252

Proposed Attorneys for the Debtor

## CERTIFICATE OF SERVICE – BY NOTICE OF ELECTRONIC FILING (CM/ECF)

I hereby certify that on May 22, 2018, I electronically filed the foregoing MOTION FOR INTERIM AND FINAL ORDERS UNDER 11 U.S.C. 105, 363, 364(c)(1), (2), AND (3), 364(d) AND 364(e), FED. R. BANKR. P. 2002, 4001, AND 9014, AND LOCAL RULE 4001-2: (1) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING ON SUPERPRIORITY AND SECURED BASIS, (2) GRANTING INTERIM RELIEF, AND (3) SCHEDULING A FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(c)

with the United States Bankruptcy Court for the District of Utah by using the CM/ECF system.

- **Gregory J. Adams**    gadams@mbt-law.com
- **Peter J. Kuhn tr**    Peter.J.Kuhn@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Suzanne.Verhaal@usdoj.gov
- **Adelaide Maudsley**    amaudsley@kmclaw.com, tslaughter@kmclaw.com
- **Mark C. Rose**    mrose@mbt-law.com, markcroselegal@gmail.com
- **Jeremy C. Sink**    jsink@mbt-law.com
- **United States Trustee**    USTPRegion19.SK.ECF@usdoj.gov

**All other parties entitled to electronic notice in this bankruptcy case**

## CERTIFICATE OF SERVICE – MAIL, E-MAIL, OTHER

I hereby certify that on May 22, 2018, I caused to be served a true and correct copy of the foregoing to be served as follows:

*__Via E-Mail:__*

| | |
|---|---|
| McDougal Loan (The McDougal Family Irrevocable Trust) | Kirk L. McDougal |
| c/o Dave McDougal | oneblackarrow@aol.com |
| david@teamworksgroup.com | |
| | Mark McDougal |
| | Mark.r.mcdougal@gmail.com |

Priscilla Davis Irrevocable Trust Loan

c/o Jerome Romero

jromero@joneswaldo.com


FFH Holdings

c/o Corey Christanell

corey@bcpstl.com


American Biotech Labs

c/o Scott Moeller

scott@ablsilver.com


MTC Industries

c/o Rodger Jonas

rodger@mtcindustries.com


Zions Bank

c/o Natalie Bass

Natalie.bass@zionsbank.com


UPS

c/o Mr. Armstrong

mxarmstrong@ups.com


Pawnee Leasing

c/o Brittany Gallegos

brittany@pawneeleasing.com and

arrow@pawneeleasing.com


American Express

c/o Daniel Moken

dmoken@zwickerpc.com


Stauber

c/o Monica Callow

monica.callow@stauberusa.com


Maypro

c/o Teresa LeCrann

teresa.lecrann@maypro.com

diane.brown@maypro.com


Anderson Global

c/o Christine Beckner

christineb@andersonglobalgroup.com


PowderPure

c/o John Ratchye

john.ratchye@powderpure.com


BI Nutraceuticals

c/o Veronica Ruiz

vruiz@botanicals.com


Bank of AF

c/o Mike McDonald

mike.mcdonald@bankaf.com


Capsugel

c/o Ronald Doyle

ronald.doyle@lonza.com


Kruse, Landa, Maycock & Ricks

c/o Lyndon Ricks

llricks@michaelbest.com


Premier Employee Solutions

c/o David Leigh

dleigh@rqn.com


U.S. Custom & Border Protection

Liza.v.ybarra@cbp.dhs.gov

Gregory.k.hood@cbp.dhs.gov


Via Email:

Jim K. Phillips

jimkphillips@gmail.com

Exemplar Design

Tim Miller

miller@taftlaw.com

_____ /s/ Jeremy C. Sink _____

SCHEDULE